UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| HOMESITE INSURANCE COMPANY )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>SETH QUIDER, and )<br>ALBERT B. SHEHADI, )<br>Conservator of the Estate of WILLIAM H. )<br>SHEHADI, JR., a conserved person )<br>    Defendants, )<br>) | Civil Action No.<br><br><br><br><br><br>MARCH 26, 2021 |

## COMPLAINT SEEKING A DECLARATORY JUDGMENT

1. The plaintiff, Homesite Insurance Company ("Homesite"), is an insurance company incorporated in Wisconsin and with its principal place of business in Boston, Massachusetts that is authorized to do business and issue policies of insurance in Connecticut.

2. Defendant Seth Quider ("Quider") is an individual residing at 12 Middlesex Drive, Enfield, Connecticut.

3. Defendant Albert B. Shehadi ("Albert Shehadi") is the brother, conservator of the estate, and co-conservator of the person of William H. Shehadi, Jr. ("Mr. Shehadi"). Albert Shehadi brought the underlying action on behalf of Mr. Shehadi. Both are residents of the State of Connecticut.

4. The jurisdiction of this court is based on diversity of citizenship, pursuant to 28 U.S.C. § 1332.

### UNDERLYING ACTION

5. Plaintiff seeks a declaration of the court that it has no duty to defend or indemnify the Defendant Quider in a lawsuit filed against him by Albert Shehadi on behalf of Mr. Shehadi

in the District of Connecticut, known as *William H. Shehadi, Jr., et al. v. Mark Cusson, et al.*, Dkt. No. 3:18-cv-360-MPS (the "Underlying Action").

6. On March 1, 2018, Albert Shehadi filed the operative Complaint ("Underlying Complaint") on behalf of Mr. Shehadi in the Underlying Action, a copy of which is attached hereto as **Exhibit A**.

7. The Underlying Action involves claims for damages that are reasonably in excess of $75,000, exclusive of interest or costs. The Homesite Policy at issue here has liability limits of $500,000. Therefore, the amount in controversy is in excess of $75,000.

8. According to the Underlying Complaint, Mr. Shehadi has a long history of treatment for psychiatric illnesses and behavioral problems and has been confined and involuntarily institutionalized at the Whiting Forensic Division of Connecticut Valley Hospital ("Whiting") since 1995.

9. According to the Underlying Complaint, Mr. Shehadi's "treatment plan has required 24/7 supervision by two Whiting staff members to ensure his safety and wellbeing."

10. According to the Underlying Complaint, Quider was at all relevant times a "Forensic Treatment Specialist" at Whiting, "employed and paid by the State of Connecticut, responsible for providing human and dignified care and supervision to" Mr. Shehadi.

11. According to the Underlying Complaint, Quider was, at all relevant times, acting in the course and scope of his employment and under the color of state law.

12. According to the Underlying Complaint, Quider and others inflicted "unrelenting sadistic abuse, neglect, exploitation, humiliation and psychological torture" on Mr. Shehadi from February 27 to March 22, 2017.

13. Specifically, the Underlying Complaint alleges that Quider:

a. On March 1, "repeatedly kicked and pushed [Mr. Shehadi] until he finally fell out of bed onto the floor" and then "kicked him again in his torso" after he "got up and got back into bed"; Underlying Complaint at ¶¶ 27(C)(8)-(9);

b. On March 3, "put his feet on [Plaintiff's] bed, with one foot touching [Plaintiff's] arm, and used his feet to repeatedly tug on [Mr. Shehadi's] sheets"; id. at ¶ 27(D)(17);

c. On March 4, "kicked [Mr. Shehadi] multiple times" as he was lying in bed and "then draped his legs over [Mr. Shehadi's] chest while [Mr. Shehadi] thrashed his lower limbs; id. at ¶ 27(E)(3)

   i. Quider is also alleged to have been present during and witnessed abuse (including repeated kicking, a threatened towel snap, poking with a shoe, and kicking his mattress from the frame) by a co-defendant; id. at ¶¶ 27(E)(1)-(2);

d. On March 6, "slept in a chair with his feet on [Mr. Shehadi's] bed while [Mr. Shehadi] objected, "dropped his leg onto [Mr. Shehadi] as soon as [Mr. Shehadi] settled down, then kicked [Mr. Shehadi] in the shoulder", and "repeatedly hit and poked [Mr. Shehadi] in the head"; id. at ¶¶ 27(G)(1)-(2), (9);

e. On March 13, "rolled his chair around [Mr. Shehadi's] room repeatedly kicking [Mr. Shehadi's] arm every time he attempted to drink from a cup, causing the liquid to spill onto the floor", "repeatedly kicked [Mr. Shehadi], and put his leg on [Mr. Shehadi], as [Mr. Shehadi] sat in bed", and "ripped the sheet away from [Mr. Shehadi] while [a co-defendant] watched and laughed"; id. at ¶¶ 27(M)(1)-(2), (5);

f. On March 16, "disturbed [Mr. Shehadi] with fluid, causing [Mr. Shehadi] to jolt up in bed, frantically move about the bed, and cry into his sheets"; id. at ¶ 27(P)(1);

g. On March 17, "put a towel on the back of [Mr. Shehadi's] neck and pushed him down"; id. at ¶ 27(Q)(7);

h. On March 18, "ripped [Mr. Shehadi's] shirt down the back" and "forcibly flipped [Mr. Shehadi] off his bed and threw his mattress on the floor"; id. at ¶¶ 27(R)(1)-(2); and

i. On March 19, "rolled his chair into [Mr. Shehadi's] room, where [Mr. Shehadi] lay covered with a sheet, put his feet on [Mr. Shehadi's] bed, then, holding a bottle of liquid, stood up, began shaking [Mr. Shehadi], and poured the liquid onto [Mr. Shehadi's] head approximately 10 times over the course of 10 minutes", "poked [Mr. Shehadi] until he got back into bed" after he had gotten out of bed, "brought a gallon type container of liquid into [Mr. Shehadi's] room, took [Mr. Shehadi's] sheet and blanket away, raised the contained over [Mr. Shehadi's] head and poured the liquid on [Mr. Shehadi's] head intermittently for approximately three minutes", "again poured liquid on [Mr. Shehadi] while he was lying down" after the bed linens were changed "and then again after he got out of the wet bed", and "shook [Mr. Shehadi's] mattress, flipping [Mr. Shehadi] onto the floor." Id. at ¶¶ 27(S)(1)-(5).

3

14. According to the Underlying Complaint, these actions were captured on video tape. Furthermore, according to the Underlying Complaint, a subsequent investigation by the State determined that Quider and others had violated DHMAS General Work Rule 19 (prohibiting "physical violence, verbal abuse, inappropriate or indecent conduct and behavior that endangers the safety and welfare o[f] persons or property").

15. According to the Underlying Complaint, Quider and others were "subsequently arrested and charged with multiple counts of Cruelty to Persons in violation of Conn. Gen. Stat. § 53-20(1)(a), and multiple counts of Disorderly Conduct in violation of Conn. Gen. Stat. § 53a-182."

16. The First Claim of the Underlying Complaint asserts violations of the 14th Amendment's guarantees of safe conditions of confinement and freedom from the use of excessive force by state agents and employees, pursuant to 42 U.S.C. § 1983. It alleges that Quider and the other defendants were "deliberately indifferent" to Mr. Shehadi and "acted intentionally and/or they recklessly failed to act with reasonable care even though they knew or should have known that [Mr. Shehadi] was subjected to an excessive risk of harm."

17. The Second Claim of the Underlying Complaint asserts violations of the 14th Amendment's guarantee of a right to protection from harm, pursuant to 42 U.S.C. § 1983. It alleges that Quider and the other defendants were "deliberately indifferent" to Mr. Shehadi and "acted intentionally and/or they recklessly failed to act with reasonable care even though they knew or should have known that [Mr. Shehadi] was subjected to an excessive risk of harm."

18. The Third Claim of the Underlying Complaint asserts violations of the 14th Amendment's guarantee of a right to reasonable medical and mental health care, pursuant to 42 U.S.C. § 1983. It alleges that Quider and the other defendants were "deliberately indifferent" to

4

Mr. Shehadi and "acted intentionally and/or they recklessly failed to act with reasonable care even though they knew or should have known that [Mr. Shehadi] was subjected to an excessive risk of harm."

19. The Fourth Claim of the Underlying Complaint asserts a state-law claim of assault and battery. It alleges that Quider and the other defendants "acted intending to cause harmful or offensive contacts with [Mr. Shehadi's] body or imminent apprehensions of such contacts" and that they "acted intentionally or under circumstances showing a reckless disregard of the consequences of his actions."

20. The Fifth Claim of the Underlying Complaint asserts a state-law claim of recklessness. It alleges that Quider and the other defendants were "consciously aware of the fact that he created and/or allowed a substantial risk to" Mr. Shehadi and, despite this, "failed to take necessary and appropriate steps to reduce or eliminate the risk" and "took affirmative steps to exacerbate the risk and to make harm and injury to [Mr. Shehadi] more likely."

21. The Sixth Claim of the Underlying Complaint asserts a state-law claim of intentional infliction of emotional distress. It alleges that Quider and the other defendants "intended to inflict emotional distress or . . . knew or should have known that emotional distress was the likely result of his acts and omissions."

## THE HOMESITE POLICY

22. Prior to the incidents at issue in the Underlying Action, Homesite had issued a homeowner's insurance policy naming Seth Quider as a named insured, which policy bore policy number 33115126 (the "Homesite Policy"). The Homesite Policy was in effect on the dates of the incidents at issue in the Underlying Action. A true and correct copy of the Homesite Policy—including all amendments thereto—and its Declarations Page is attached hereto as **Exhibit B**.

23. The Homesite Policy provides that "[i]f a claim is made or a suit is brought against an 'insured' for damages because of 'bodily injury' or 'property damage' caused by an 'occurrence' to which this coverage applies" Homesite will "[p]rovide a defense" and "[p]ay up to our limit of liability for the damages for which the 'insured' is legally liable."

24. In relevant part, the Homesite Policy defines "bodily injury" as "bodily harm, sickness or disease, including required care, loss of services and death that results[.]" The definition of "bodily injury" is also amended to include certain "personal injury", but no such "personal injury" is alleged in the Underlying Action.

25. The Homesite Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in . . . 'Bodily injury'; or. . . 'Property damage.'"

26. The Homesite Policy's defense and indemnity coverage does "not apply to 'bodily injury' or property damage' . . . [w]hich is expected or intended by the 'insured' even if the resulting "bodily injury" or "property damage" . . . [i]s of a different kind, quality or degree than initially expected or intended; or . . . [i]s sustained by a different person, entity or property than initially expected or intended" (hereinafter the "Intentional Acts Exclusion").

27. The Homesite Policy defines "business" as

    a. A trade, profession, occupation, or enterprise engaged in on a full-time, part-time or occasional basis;
    b. The lease of land, buildings, structures or personal property; or
    c. Any other activity engaged in for money, expectation of remuneration or monetary gain, or other compensation, financial or otherwise, except the following:
        1. Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;
        2. Providing home day care services for which no compensation is received, other than mutual exchange of such services; or
        3. The rendering of home day care services to a relative of an "insured".

28. The Homesite Policy's defense and indemnity coverage does "not apply to 'bodily injury' or property damage' . . . Arising out of or in connection with a 'business' conducted from an 'insured location' or engaged in by an 'insured', whether or not the business is owned or operated by an 'insured' or employs an 'insured.' . . . This Exclusion . . . applies but is not limited to an act or omission, regardless of its nature or circumstances, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the 'business'" (hereinafter the "Business Exclusion").

29. The Homesite Policy's defense and indemnity coverage does "not apply to 'bodily injury' or property damage' . . . [a]rising out of the rendering or failure to render professional services" (hereinafter the "Professional Services Exclusion").

30. The Homesite Policy's defense and indemnity coverage does "not apply to 'bodily injury' or property damage' . . . [a]rising out of sexual molestation, corporal punishment or physical or mental abuse" (hereinafter the "Abuse Exclusion").

31. The Homesite Policy's defense and indemnity coverage does "not apply to 'bodily injury' or property damage' . . . [a]rising out of a criminal act of any 'insured'" (hereinafter the "Criminal Acts Exclusion").

32. The Homesite Policy's defense and indemnity coverage does "not apply to 'bodily injury' or property damage' . . . [a]rising out of an intentional and malicious act by or at the direction of the 'insured'" (hereinafter the "Intentional and Malicious Acts Exclusion").

33. The Homesite Policy provides that Homesite "will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy."

34. The Homesite Policy imposes certain "Conditions", which duties an insured must perform and/or see are performed, including:

    a.    Give written notice to [Homesite] or our agent as soon as is practical, which sets forth:
        (1)    The identity of the policy and 'insured';
        (2)    Reasonably available information on the time, place and circumstances of the accident or 'occurrence'; and
        (3)    Names and addresses of any claimants and witnesses;

    b.    Promptly forward to [Homesite] every notice, demand, summons or other process relating to the accident or 'occurrence'

## FURTHER BACKGROUND

35. Quider was arrested on or about September 5, 2017 on criminal charges related to the incidents alleged in the Underlying Action.

36. Quider ultimately pled nolo contendere in Connecticut state court to criminal charges related to the incidents alleged in the Underlying Action in a matter known as *State v. Quider*, Dkt. No. MMX-CR17-0212735-T.

37. Quider was served with process in the Underlying Action on or about March 6, 2018.

38. Quider first appeared in the Underlying Action, through counsel, on or about March 21, 2018.

39. Quider first provided notice of any kind to Homesite regarding the Underlying Action and/or any of the incidents alleged therein on October 23, 2020.

40. Prior to October 23, 2020, Quider had not forwarded to Homesite any notice, demand, summons, or other process regarding the Underlying Action and/or any of the incidents alleged therein.

**FIRST COUNT (Declaratory Judgment)**

41.     Homesite has retained counsel to defend Quider in the Underlying Action under a complete reservation of rights.

42.     Homesite is entitled to a declaration that it does not have a duty to defend or indemnify Quider in the Underlying Action based upon the terms, definitions, conditions, exclusions, and other language of the Homesite Policy for multiple reasons, including but not necessarily limited to the following:

   a. Some or all of the Underlying Action does not allege damages because of "bodily injury" or "property damage" caused by an "occurrence";
   b. Some or all of the loss alleged in the Underlying Action is excluded from coverage by the Intentional Acts Exclusion;
   c. Some or all of the loss alleged in the Underlying Action is excluded from coverage by the Business Exclusion;
   d. Some or all of the loss alleged in the Underlying Action is excluded from coverage by the Professional Services Exclusion;
   e. Some or all of the loss alleged in the Underlying Action is excluded from coverage by the Abuse Exclusion;
   f. Some or all of the loss alleged in the Underlying Action is excluded from coverage by the Criminal Acts Exclusion;
   g. Some or all of the loss alleged in the Underlying Action is excluded from coverage by the Intentional and Malicious Acts Exclusion; and
   h. Quider failed to comply with all applicable provisions of the Homesite Policy, including his obligations to give written notice to Homesite as soon as was practical of the required details set forth above and/or to promptly forward to Homesite every notice, demand, summons or other process relating to any accident or "occurrence" at issue in the Underlying Action.

43.     There are actual, bona fide, substantial questions and issues in dispute and a substantial uncertainty of the legal relations between the parties that requires settlement. The issues of Homesite's purported defense and indemnity obligations to Quider regarding the Underlying Action are real and immediate and ripe for adjudication, such that a declaratory judgment on these issues can provide specific and conclusive relief.

WHEREFORE, pursuant to 28 U.S.C. § 2201 and/or Fed. R. Civ. P. 57, Plaintiff Homesite Insurance Company seeks a declaratory judgment that:

1. Homesite Insurance Company has no duty to provide a legal defense to Seth Quider for the claims against him in civil action brought against him in the District of Connecticut matter known as *William H. Shehadi, Jr., et al. v. Mark Cusson, et al.,* docket number 3:18-cv-00360-MPS, because there is no coverage—and/or coverage is excluded—for the claims under the Homesite Homeowners Policy number 33115126; and

2. Homesite Insurance Company has no duty to indemnify Seth Quider for the claims against him in civil action brought against him in the District of Connecticut matter known as *William H. Shehadi, Jr., et al. v. Mark Cusson, et al.,* docket number 3:18-cv-00360-MPS, because there is no coverage—and/or coverage is excluded—for the claims under the Homesite Homeowners Policy number 33115126.

                PLAINTIFF
                HOMESITE INSURANCE COMPANY

By: /s/ James E. Ringold
    James E. Ringold (ct29536)
    Loughlin FitzGerald, P.C.
    150 South Main Street
    Wallingford, CT 06492
    Tele.:  203-265-2035
    Fax:    203-269-3487
    Email: jringold@lflaw.com